UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LARRY HARRIS,<br>    Plaintiff,<br><br>v.<br><br>CITY OF PROVIDENCE,<br>    Defendant. | C.A. No. 19-548-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Larry Harris brings this civil rights lawsuit against his former employer, the City of Providence, claiming the City denied him promotional opportunities because of his race and retaliated against him for filing a charge of discrimination. The work environment was so hostile that Mr. Harris felt he had no choice but to resign his position, translating to a constructive discharge. The City denies these claims and moves for summary judgment. ECF No. 19. After a thorough review of the briefing and record, the Court finds that this case contains both disputed facts, and disputes as to how the facts apply to the law. The City's Motion for Summary Judgment is DENIED.

I.  BACKGROUND[1]

Mr. Harris was employed by the City of Providence Department of Inspection and Standards since 1995. He held various jobs until 2015 when the City promoted him to Assistant Supervisor of Structures and Zoning.

When his immediate supervisor retired in late 2016, Mr. Harris served as de facto acting Supervisor of Structures and Zoning. He planned to officially apply for this promotion, but unbeknownst to Mr. Harris, the City had reorganized the Department, eliminating the Supervisor of Structures and Zoning position. It created a new position of Plan Examiner and posted the job on the Department's Bulletin Board.

Not only did the City never inform Mr. Harris that it had eliminated the position to which he planned to ascend, but it also moved the location of the job posting board from outside Mr. Harris's cubicle to the "cafeteria,"[2] a room that Mr. Harris never used so he never saw the Plan Examiner posting until after he had missed the opportunity to apply. The Department Director Jeffrey Lykins,[3] however, personally told Mr. Harris's coworker, Stanley Dickenson about the new position. Mr. Dickenson, a coworker with much less seniority than Mr. Harris and whose

---

[1] The Court recounts the facts in light most favorable to Mr. Harris, the non-movant. *Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc.*, 999 F.3d 37, 43 (1st Cir. 2021).

[2] The "cafeteria" was more like a break room that the Mayor, workforce solutions, Law Department, and others used as a meeting room.

[3] Mr. Lykins no longer works for the City of Providence.

2

qualifications were at least as comparable to those of Mr. Harris, got the Plan Examiner job.

At that time, Mr. Harris was the only African American employee of the thirty-four Department employees. Mr. Harris complained to the City's Equal Employment Opportunities Office. In August 2017, he filed charges of race discrimination with the Rhode Island Commission for Human Rights and the Equal Employment Opportunity Commission.

Two months after Mr. Harris filed his complaints, the City posted two positions for Senior Plan Examiners. Both Mr. Harris and Mr. Dickenson bid for these positions and the City awarded both men the jobs.[4] It was at this point, when Mr. Harris began working as a Senior Plan Examiner, that his troubles began. He needed training to do the job but received none. He asked his supervisors for help many times and they gave him none. He complained to his Union representation about the City's refusal to train him, but nothing changed. Mr. Harris claims that the City's refusal to provide any training to him was in retaliation for his decision to file the discrimination claims.

Mr. Harris was also ostracized within the Department. He alleges that Mr. Dickenson seemed to go out of his way to disrespect him. ECF No. 24-2 ¶ 17. Senior staffers would talk about Department issues but would stop talking when Mr. Harris approached. He was never included in coffee or lunch meetings where

---

[4] The City of Providence no longer employs Mr. Dickenson.

3

work projects were discussed, further limiting his ability to learn the job and do it well. *Id.* ¶ 18. One co-worker, Johnny Suarez would occasionally include him. *Id.*

After more than two months on the job, Mr. Harris felt so defeated by the hostile work environment where he not only received no training or support from senior staff, but also was subjected to discriminatory treatment, that he had no choice but to resign before he was terminated or demoted. *Id.* ¶ 22. This lawsuit followed.

## II. STANDARD OF REVIEW

Summary judgment is a drastic remedy because it deprives the parties of the opportunity to have a jury decide the outcome of their dispute as enshrined in the Seventh Amendment to the United States Constitution. U.S. CONST. AMEND. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). Thus, the law requires that all reasonable inferences be drawn against the moving party and that the court grant summary judgment if the undisputed facts and inferences that flow from them allow for only one reasonable conclusion in favor of the movant. *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The Court should "tak[e] the facts in the light most favorable to the non-moving party and draw [] all reasonable inferences in his favor." *Barraford v. T & N Ltd.*, 778 F.3d 258, 263 (1st Cir. 2015).

Under Fed. R. Civ. P. 56, a party is entitled to summary judgment only if "no genuine dispute [exists] as to any material fact" and if the undisputed facts show that the party is "entitled to judgment as a matter of law." *Knight*, 836 F.2d at 664

(undisputed material facts, together with inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the movant" to justify summary judgment). A material fact is one that "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

Mr. Harris brings a five-count complaint,[5] alleging that the City violated the Rhode Island Fair Employment Practices Act – Discrimination (R.I. Gen. Laws § 28-5-1) (Count I); federal Unfair Employment Practices Act - Discrimination (Title VII, 42 U.S.C. § 2000e-2) (Count II); federal Unfair Employment Practices Act - Retaliation (Title VII, 42 U.S.C. § 2000e-3) (Count III); Rhode Island Fair Employment Practices Act – Retaliation (R.I. Gen. Laws § 28-5-7(5)) (Count IV); and state Civil Rights Act of 1990 (R.I. Gen. Laws § 42-112-1) (Count V). The City argues that Mr. Harris cannot prove that it engaged in any discriminatory practices or that he was constructively discharged. In his response to the City's motion, Mr. Harris counters that the City manipulated the hiring process for the Plan Examiner position and deprived him of the necessary support and training after his promotion to Senior Plan Examiner.

### A. Discrimination Claims

Mr. Harris brings three claims for discrimination, Counts I, II, and V, under state and federal law. These claims cover two primary areas of discriminatory

---

[5] Mr. Harris withdrew his Count VI – Civil Rights Act of 42 U.S.C. § 1981.

5

conduct: the City manipulated the hiring process when it posted and awarded the position of Plan Examiner in 2017 such that he could not apply and the City failed to train or support him when he took the Senior Plan Examiner position, setting him up for failure and giving him no choice but to resign. The City responds by claiming that it did not discriminate against Mr. Harris, that it properly posted the Plan Examiner position, even though Mr. Harris did not apply, it treated him the same as all other employees once he took the Senior Plan Examiner position, and that the City did not force him to resign, he quit the job on his own. The Court will address these arguments in the context of Mr. Harris's Title VII claims.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2(a)(1), or "to limit, segregate, or classify [his] employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [his] status as an employee," based on a protected characteristic. 42 U.S.C. § 2000e–2(a)(2). Mr. Harris's failure-to-promote claim rests on the premise that the City treated him differently from his Caucasian co-workers because he is African American. "The inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff on the basis of a protected attribute." *Cumpiano v. Banco Santander*, 902 F.2d 148, 153 (1st Cir. 1990).

Mr. Harris admits that he does not have direct proof of racial discrimination, but the law does not require it. *U.S. Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711,

6

716–17 (1983). In these circumstances, the Court analyzes his claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this paradigm, Mr. Harris first must establish a prima facie case of racial discrimination. *McDonnell Douglas*, 411 U.S. at 802. Because his claim is based on being passed over for a promotion, he must prove that he (i) is a member of a protected class who (ii) was qualified for an open position for which he applied, but (iii) was rejected (iv) in favor of someone possessing similar qualifications. *Id.*

Here, no one disputes that Mr. Harris, as an African American, is a member of a protected class, was at least reasonably qualified for the position of Plan Examiner, and the City passed over him for the promotion and hired someone with similar qualifications. He has made out a prima facie case.

The burden then shifts to the City to articulate "some legitimate, nondiscriminatory reason" for its employment action. *Id.* "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

The City offers several nondiscriminatory reasons for not promoting Mr. Harris. First, Mr. Harris did not apply, and the successful candidate, Mr. Dickenson, was more qualified because he had been a building inspector longer and he had a greater depth of relevant experience. These documented reasons for

7

passing over Mr. Harris for the promotion are not based on his race and so the City has met its burden under *McDonnell Douglas* to put forth a legitimate, nondiscriminatory reason for not hiring him.

The burden then shifts back to Mr. Harris to show that the reason proffered was a pretext or "a coverup" for a "discriminatory action." *McDonnell Douglas*, 411 U.S. at 804-805. The Court therefore must decide whether Mr. Harris has presented evidence that shows there is a genuine dispute about whether the City's stated reasons were pretext, and the City did not promote him because of his race.

Mr. Harris points to the fact that the City seemed to go out of its way to ensure that he – the only African American employee in the Department – did not see the job posting. And around that same time the City put a posting up and took it down minutes later. The City has offered no evidence that it had a legitimate nondiscriminatory reason for changing the posting location from an area where Mr. Harris knew to look for job postings to a place where he would never see them. The Court finds from this record that a jury could infer that the City did not want Mr. Harris to know about the Plan Examiner position and acted to prevent him from applying for the promotion. The City's defense that Mr. Harris did not apply or was less qualified was a pretext for illegal discrimination.

B. Retaliation Claims

Mr. Harris also brings two claims for retaliation, Counts 3 and 6, under state and federal law. When Mr. Harris found out that the City eliminated the position of Supervisor of Structures and Zoning, he filed a charge of discrimination with the

Rhode Island Commission for Human Rights and the Equal Employment Opportunity Commission. The City promoted Mr. Harris to the position of Senior Plan Examiner just two months after he filed his charge of discrimination, and once he was in the position, the City retaliated against him by withholding essential training, leaving him to struggle, and ultimately fail in the position.

Withholding essential training can be a form of discrimination and retaliation. *Howard v. Jacobs Eng'g, Inc.*, 716 F. Supp. 2d 510, 520 (S.D. Tex. 2008) ("[a] jury could [] infer that the initial lack of training set off a chain of events that lead to a racially motivated decision to fire him."). Mr. Harris received almost no support or training once promoted to the position of Senior Plan Examiner. Because the City did not implement formal training for most positions, when a candidate moved up the ranks, other staffers and supervisors would work with the person to guide and instruct them in their new job responsibilities. Using this method of training, many staffers could move up the ranks quickly. Like others, Mr. Harris depended on support from his coworkers and supervisors to learn his new job. He asked for help many times, yet no one gave him any. In fact, most of the staff at his level ostracized him. For example, Rodis Rodriguez, an Electrical Inspector II for the City, witnessed the mistreatment of Mr. Harris first-hand:

> I have [] witnessed discriminatory treatment toward Larry Harris, one of the few African Americans in the department. Larry has been repeatedly passed over for promotion, until he filed a charge of discrimination, at which time the City finally promoted him. However, even though Mr. Harris is now a senior inspector in the department, he is repeatedly excluded from meetings (both professional and social) among senior (Caucasian) inspectors.

9

ECF No. 24-3 ¶ 10.

The City denies depriving support and training to Mr. Harris, stating that Plan Examiner Johnny Suarez, who was in a lower position than Mr. Harris, could help him. Mr. Suarez noticed that Mr. Harris was struggling at his job and took pity on him. ECF No. 26-2 at 2. He observed that Mr. Harris needed help and he helped him when he could but did "not recall anyone else helping Larry at that time." *Id.* at 3. Mr. Suarez also confirmed that when he was promoted to Senior Plan Examiner after Mr. Harris resigned, he relied on other people in the Department to teach him aspects of the position. *Id.* at 2.

Not only did the City neglect Mr. Harris's training, his co-workers and supervisors treated him differently than others in the Department. Mr. Dickenson seemed to go out of his way to disrespect Mr. Harris. He would sit across from Mr. Harris, place his feet up on his desk, and speak to him in a dismissive manner about office gossip. ECF No. 24-2 ¶ 17. One of Mr. Harris's subordinates noticed Mr. Dickenson doing this once and confronted him about the disrespectful way that he was treating Mr. Harris. *Id.* And the senior building department staffers – the people who should have been providing most of the training to Mr. Harris – did not welcome his presence. They would congregate in one area of the Department, conversing about different issues they were facing during the day, but if Mr. Harris approached, they would stop talking. Several times a week, they would go out for coffee or lunch to discuss issues arising in various construction projects, but they never invited Mr. Harris except one time by Johnny Suarez. *Id.* ¶ 18. The City and

its employees intentionally acted in a way that made Mr. Harris feel embarrassed and humiliated. *Id.* at ¶ 22.

The First Circuit Court of Appeals has said that, in reviewing the pleadings of a retaliation claim, "very close" temporal proximity can prove causation when supported by more context in the complaint. *Sánchez-Rodríguez v. AT & T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012) (quoting *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004)). In this case, the Court finds that a jury could infer and find that the City retaliated against Mr. Harris by failing to train him, treating him with lack of respect, all with an aim of making him fail in his new position because he filed a charge of discrimination against the City.

### C. Constructive Discharge

Mr. Harris alleges that the City retaliated against him by refusing to provide training resulting in him feeling embarrassed, humiliated, and discriminated against because of his race, making it impossible for him to continue to work for the City. The City counters that its conduct did not force Mr. Harris to leave but he voluntarily retired.

"To take the measure of a claim of constructive discharge, an inquiring court must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). "The ultimate test is one of objective reasonableness." *Id.*

"[T]he constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics." *Id.* "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting [him], reducing [his] salary, or divesting [him] of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service." *Blackie v. Maine*, 75 F.3d 716, 725–726 (1st Cir. 1996) (citations omitted). If, after such intolerable treatment, "a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." *Landrau–Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000).

Mr. Harris has set forth evidence, if believed by the fact finder, which could show that the lack of training and support, discriminatory treatment, and the City's tolerance of disrespect from his co-workers, especially when he was the only African American person in the Department, all combined to satisfy the legal standard for constructive discharge. In a case like this where there are disputed facts and much of the evidence will come through testimony about the working conditions in the Department, it is even more important for the Court to leave the fact finding to a jury to evaluate witness credibility.

## IV. CONCLUSION

There are genuine issues of material fact that exist that a jury must decide. The Court therefore DENIES the City's Motion for Summary Judgment. ECF No. 19.[6]

IT IS SO ORDERED.

/s/ John J. McConnell, Jr.
_____
John J. McConnell, Jr.
Chief United States District Judge

February 23, 2022

---

[6] Note: Mr. Harris voluntarily dismissed Count VI. *See* footnote 5 at page 5.